## PACKINEAU et al. v. UNITED STATES.
### No. 14616.

United States Court of Appeals
Eighth Circuit.
March 10, 1953.

682

J. K. Murray, Bismarck, N. D., for appellants. (Submitted on Briefs.)

Harry Lashkowitz, Asst. U. S. Atty., Fargo, N. D. (P. W. Lanier, U. S. Atty., Fargo, N. D., on the briefs), for appellee.

Before SANBORN, WOODROUGH, and RIDDICK, Circuit Judges.

WOODROUGH, Circuit Judge.

Appellants were convicted under an indictment in one count charging both of them with the crime of rape committed on an Indian reservation in violation of Section 1153, Title 18, U.S.C., which provides: "Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, * * * rape, * * * within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States. As used in this section, the offense of rape shall be defined in accordance with the laws of the State in which the offense was committed, and any Indian who commits the offense of rape upon any female Indian within the Indian country, shall be imprisoned at the discretion of the court."

The statutes of the State of North Dakota in this regard, and as applied in this case, provide, Section 12–3001, R.C.N.D. 1943: "Rape is an act of sexual intercourse accomplished with a female not the wife of the perpetrator, under any of the following circumstances: * * * (3) When she resists, but her resistance is overcome by force or violence; * * *".

The indictment charged, in substance, that on or about the 14th day of July, 1951, within the confines of the Fort Berthold Indian Reservation in North Dakota the defendants, Calvin Packineau and Joseph White Bear, Jr., both of whom were Indians, "did with force and violence, and after overcoming the resistance of one Loretta Bear, have sexual intercourse with said Loretta Bear, who was then and there a female Indian, * * * and not the wife of the said Calvin Packineau and not the wife of the said Joseph White Bear, Jr."

The defendants were tried together, and the case was submitted to the jury on the

theory of the prosecution that defendant White Bear committed the unlawful act of intercourse and that defendant Packineau, while he admittedly did not have sexual intercourse with the prosecutrix himself, was guilty as charged in that he had aided, abetted, induced or procured the commission of the crime by defendant White Bear, and thus was punishable as a principal under the provisions of Section 2(a) of Title 18, U.S.C.: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

Defendant Packineau was sentenced to four years and defendant White Bear to five years in the penitentiary.

Viewing the evidence in the light most favorable to the government it appears that on the evening of July 14, 1951, between the hours of 10:00 and 11:00 P.M., defendants drove in defendant Packineau's automobile to the home of Neola Spotted Horse, an Indian friend of the prosecutrix, where the prosecutrix had been visiting for several days. At this time defendant Packineau was 26 years of age, defendant White Bear was 20 years of age, and the prosecutrix was also 20. The defendants saw Neola outside of her home and asked her to go out with them for a ride and to go into the house and invite Loretta to go along with them. Loretta at the time was about to go to bed, but she decided to go and the two women got in the back seat of the car.

Both of the women knew defendant White Bear. Loretta had attended school with him some years before. Loretta did not know the defendant Packineau before the night in question, but her friend Neola did.

The party rode a short distance with the young men in the front seat and the young women in the back, but shortly afterwards Loretta got into the front seat with Packineau and defendant White Bear got into the rear seat with Neola. The ride continued after a few stops, and finally Packineau parked the car on a side road or lane. There the group talked and listened to the car radio.

The defendants had a bottle of whiskey and a bottle of wine in the car. The whiskey and the wine were drunk by the group, the girls drinking at the insistence of the men. During the time they were in the car together defendant Packineau made some attempts to embrace the prosecutrix but she rebuffed him and he desisted.

The prosecutrix testified that at about 2:30 in the morning they were still sitting in the car. At that time she felt sick and got out of the automobile to vomit. Defendant Packineau followed her and again attempted to embrace her. She again resisted and struggled with Packineau, and the two of them fell to the ground. The struggle continued and Packineau tore some of her clothing. He was attempting to have intercourse with her. Finally Packineau struck the prosecutrix in the jaw with his fist. The blow damaged two of her teeth so that they had to be pulled about a month afterwards, and stunned her. After he had struck the blow Packineau got up and walked away. Admittedly he had no intercourse with her then or at any other relevant time.

As the prosecutrix lay stunned on the ground, defendant White Bear approached her and after she recovered consciousness she was aware of him right beside her. He then committed the act of rape upon her, against her resistance, according to her testimony. White Bear, in his testimony, denied any act of intercourse with the prosecutrix on that night and hers was the only direct testimony in support of her accusation that he had raped her. She was injured and bruised and her clothing was torn. There were details of circumstantial evidence tending to show that scuffling had occurred around the place where she claimed the act of rape was committed.

Subsequent to the alleged rape the prosecutrix returned to the car, and then, after staying in the car for a short time while the group proceeded homeward, she got out of the car and walked a considerable distance to Neola's house. About two days later, the prosecutrix's father happened to come to the house where she was still staying. She went to her own home with him and that night reported the alleged crime

to the Indian agency. There was no evidence of an earlier complaint or accusation by her against the defendants.

■ At the conclusion of all the evidence defendant Packineau moved the court for a judgment of acquittal for lack of evidence to support a verdict or judgment against him. He contended, as he does on this appeal, that the testimony of the prosecutrix tended to show that he had the intent and attempted to have sexual intercourse with her himself but that she resisted and prevented him. He insists that there was no evidence that he was in any wise accessory to the alleged rape of the prosecutrix by the defendant White Bear.

The motion was denied and the court instructed the jury that it was the theory of the government that defendant Packineau did not have intercourse with the prosecutrix but that he was guilty as charged as an accessory in that he aided or abetted or induced or procured the commission of the crime, that is, the rape by the defendant White Bear, within the meaning of Section 2(a) of Title 18, U.S.C. which was read to the jury. That before they could convict Packineau they must find that whatever Packineau did he did with intent that White Bear should accomplish an act of intercourse with the complaining witness. That if the jury "are not satisfied beyond a reasonable doubt that Packineau did so incite, procure, aid, abet or encourage the defendant White Bear to commit the crime of rape upon complaining witness Loretta" then they should acquit.

The court did not point out with any further particularity what was intended to be included in the general expression "whatever Packineau did" and the only direct evidence of criminal conduct on his part was Loretta's testimony.

Her testimony was that after she and Packineau had spent some hours together on the front seat of the car in talk, listening to the car radio, drinking, and in some non-criminal dalliance, he followed her out behind the car and attempted to rape her. There was a tussle in which both fell to the ground and he tore her clothes and tried to force her. But she prevented him

and he failed to accomplish his purpose. He struck her a brutal blow on the jaw with such force and violence that she was stunned. But he gave up his attempt to have sexual intercourse with her and went away from her. After he had gone away the other defendant in the case made his assault upon her and according to her testimony he overcame her utmost resistance, held both her hands with one of his and forcibly consummated the rape upon her.

But she made no claim that Packineau gave the alleged rapist any help or encouragement in the commission of the crime, or that he took any part or interest in it, or had anything to do with it, or even that he was aware of it. She did not testify to any word spoken or act done to support an inference that Packineau was a party to the alleged crime of White Bear. Nor is there any support for the verdict against Packineau in the circumstantial evidence. Such circumstances as tend to show criminality on the part of Packineau are at most corroborative of Loretta's testimony that he committed the crime of assault and battery upon her. To infer from anything or all that occurred that he had interest or intent to help White Bear in his commission of that crime is mere speculation. The motion of Packineau for judgment of acquittal of rape charged against him was erroneously denied. The judgment against him should be reversed and the indictment against him dismissed.

*As to the case against White Bear.*

■ White Bear's motion for directed verdict was properly denied. A prima facie case of rape was made out against him. But it is insisted here that the court committed prejudicial error in excluding evidence and offer of proof to the effect that the prosecutrix had a short time previously been guilty of acts of unchastity with a man other than defendants. The court admitted in evidence testimony of White Bear to the effect that he himself had previously had sexual intercourse with the prosecutrix with her consent, but during the cross-examination of the prosecutrix she was questioned concerning illicit sexual relations had by her with a certain other man at a certain time. It appeared

that in September of 1950, some months before the night in question here, Loretta stayed five days at the home of a Mrs. Genevieve Swift Eagle, then present in the court room, and her husband. Prosecutrix was then employed in picking potatoes in the vicinity of Ray, North Dakota, and was eating and sleeping at the home. There was a young Indian named Roland White Tail who also ate and slept there during the whole time, and the question was put to the prosecutrix: "There were two bed rooms in that house, is that right?" Objection to the question was made on the ground that what may have happened in September, 1950, was incompetent, irrelevant and immaterial. The court stated, "The court is going to sustain your objection. If you [counsel for defendants] wish to make an offer of proof in chambers, I will hear you." Thereafter counsel for defendants went into the chambers and there made the following offer to prove:

"That in September, 1950, she [the prosecutrix] was staying at the home of Mrs. Genevieve Swift Eagle and her husband, picking potatoes in the vicinity of Ray, North Dakota; that at that time this complaining witness came to this home for the purpose of picking potatoes and stayed with Mr. and Mrs. Swift Eagle; that she brought with her to this home a young Indian about 20 years of age whose name was Roland White Tail; that the complaining witness at that time told Genevieve Swift Eagle and her husband that she, the complaining witness, and Roland White Tail had been married and were husband and wife; that during those five days they cohabited, that they, Roland White Tail and the prosecuting witness, cohabited together as man and wife, slept together in the same bed in the same room during that period of five or more days while picking potatoes."

The prosecuting attorney contended that "it is wholly immaterial whether or not the victim in a case of rape is of previous chastity." The court sustained the objection to the offer of proof and excluded proof of the previous unchastity of the prosecutrix.

The appellants contend, as they did on their motion for a new trial, that the exclusion of the proof of previous unchastity of the prosecutrix was prejudicial error, and as applied to the particular facts of this case we agree. It might be that there are cases where a woman has been set upon and forcibly ravished by strangers coming out of ambush or the like and any inquiry as to her chastity or lack of it is irrelevant.

But in this case the prosecutrix, as stated in the brief for the government, was "a very refined girl, who attended school at the Indian Agency and then went to high school and was attending Haskell, the Indian School at Lawrence, Kansas, where she was preparing herself for nurse's training". Her appearance and the evidence concerning her antecedents tended to enhance the credibility of her testimony, and to offset unfavorable inferences that might otherwise have been drawn from the part of her night's adventures that were admittedly of her own volition. Or from the fact that she made no report to the Indian Agency until two days had elapsed after the alleged offense and after her father had happened to make contact with her.

That her story of having been raped would be more readily believed by a person who was ignorant of any former unchaste conduct on her part than it would be by a person cognizant of the unchaste conduct defendants offered to prove against her seems too clear for argument.

In order to preserve the rights of defendants accused of the crime involved here, some reasonable testing of the credibility of the prosecutrix is vitally necessary to a fair trial. To an ordinary person called on to make an appraisal of Loretta's accusation that one of the young men with whom she was out for dalliance on this night had raped her, the reaction would certainly be very different if it were known that she had been openly cohabiting with a young man only a few months before than it would be if she were the unsophisticated young lady she ap-

peared to be. Sir Matthew Hale said long ago, as quoted by Blackstone: "It is true that rape is a most detestable crime and therefore ought severely and impartially to be punished with death; but it must be remembered that it is an accusation easy to be made, hard to be proved, but harder to be defended by the accused, though innocent."[1]

Here the accusation is met with flat contradiction. The case turns on the extent of credence to be given Loretta as opposed by the denials of the young men and the presumption of their innocence. To exclude the tendered proof of her concupiscence—of her having sexual lust and unlawfully indulging it—is simply to remove actual and real fairness from the trial and to reach judgment from mere appearances.

■ When we turn to the adjudicated cases we are not directed to any helpful precedent in this court. Very few rape cases have come before us. We are bound by Rule 26 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., which provides that, "The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Decisions in the state courts are therefore not controlling. They constitute a very extensive literature and, as stated at page 302 of 140 A.L.R., "there appears to be an irreconcilable conflict in the decisions over the competency and admissibility of evidence in trials for common-law rape, of previous acts of unchastity between the prosecutrix and other men than the accused". After some search we have not been able to find any controlling federal court cases directly on the point presented here.

We think, however, that the decisions in Tanksley v. United States, 9 Cir., 145 F. 2d 58, 156 A.L.R. 257, and Lovely v. United States, 4 Cir., 175 F.2d 312, fairly imply that those courts considered that the exclusion of such proof as was offered here would be erroneous. Certainly they do not lend support to such exclusion as fair or proper procedure.

In the Tanksley case, the Court of Appeals reversed a judgment of conviction of the crime of rape on the ground that the public had been excluded from the trial without sufficient reason and that defendant had therefore been deprived of his constitutional right to a public trial. In explaining how much the public trial meant to defendant in that case, the court pointed out at page 59 of 145 F.2d that a stranger present at the trial might happen to know the prosecutrix, and "Realizing the danger to the defendant of the heavy penalty for the serious crime charged, he well might advise defendant's counsel of his experience with the accusing witness." The ground for reversal was the lack of a public trial, but the inference is unmistakable that the court considered that evidence of previous unchastity of the prosecutrix was important and admissible. Indeed, Judge Wilbur, in dissenting in the case, states: "The opinion of the majority proceeds upon the theory that evidence of other acts of incontinency by the complaining witnesses would be admissible in evidence in favor of the defendant."

In the Lovely case, the opinion of the Court of Appeals reflects that on the trial of Lovely for rape the District Court had held as a matter of law that the appellant had the right to show previous sexual experience of the prosecutrix. There was no direct affirmance of that holding in the Court of Appeals but neither was it discredited. The court thought defendant had not had any substantial proof of previous unchastity of the prosecutrix to offer.

Wigmore has given extensive consideration to the question arising in trials for rape whether to admit or exclude evidence of previous unchaste conduct of the prosecutrix with a man other than the defendant, and he declares unequivocally, "The better view is that which admits the evi-

---

1. Blackstone, Commentaries on the Laws of England, Book IV, Chap. 15, Section III.

dence." Wigmore on Evidence, Vol. I, Sec. 200.

No good purpose could be served here by undertaking to review the great volume of state court decisions that culminate in irreconcilable conflict. Nor is this court called on to make a general declaration of law to be applied in all trials for rape. It suffices to point out that this case against White Bear practically resolves itself to the question whether Loretta's testimony is so convincing of defendant's guilt as to remove all reasonable doubt, both that which arises from the presumption of innocence and from defendant's denials under oath; that the prosecutrix here had voluntarily placed herself in such an equivocal position with the young men in the middle of the night in the remote and secluded spot that it is harder to get at the real truth than it might be in other situations. It is therefore held that in the situation here presented it was error to exclude the proffered evidence of Loretta's prior unchaste conduct.

█ Since the case as to White Bear must be remanded for a new trial, attention should be called to our decision in the case of Echert v. United States, 8 Cir., 188 F.2d 336, 343, 26 A.L.R.2d 752. In that case, one defendant was questioned as to certain times he had been arrested, and another was questioned as to previous marriages and divorces. Judgments of conviction were reversed as to both of these defendants, the court stating, "It is an established rule that 'Acts of misconduct, not resulting in conviction of a crime, are not the proper subject of cross-examination to impeach a witness'."

█ In the case at bar, the transcript discloses that the following took place on cross-examination of defendant White Bear:

"Q. Let's get the record straight. You married in '51, did you say? A. That is right.

"Q. Last December? [The trial took place in March.] A. December, that is right.

"Q. You have two children? A. I have two children.

"Q. You are the father of those two children? A. That is right.

"Q. Before you married? A. That is right."

It appears that an agent of the Federal Bureau of Investigation named Harvey was at the jail trying to get the defendants to talk to him about the rape accusation against them and on the advice of counsel they refused, as was their right. The prosecutor was permitted to cross examine as to why they would not talk to Harvey about the case and as to their being then in jail and as to their having been in jail on numerous occasions. Cross-examination of Packineau included the following:

"And you were in the tribal jail there for disorderly conduct, weren't you, at the time that Harvey saw you? Isn't that true? A. For disorderly conduct?

"Q. Yes. A. I don't think so.

"Q. What were you in there for? A. For liquor.

"Q. For liquor? A. That is what they told me.

"Q. You mean for being drunk that you were in jail? A. No, he just said liquor charge and drunk, he said.

"Q. Who said that? A. The judge up there.

"Q. Beauchamp? A. That is right.

"Q. You have been in that jail a good many times?

"Mr. Murray: Just a minute, we object to that as prejudicial and improper cross-examination, wholly collateral matters.

"The Court: Overruled.

"Q. (By Mr. Lashkowitz) Isn't that right? A. Not too many.

"Q. Well, how many times?

"Mr. Murray: This is highly prejudicial and improper cross-examination.

"The Court: You referred to it in your statement to the jury, Mr. Murray.

"Mr. Murray: I said he was convicted.

"Mr. Lashkowitz: Well, you did. You opened it up. We don't want to commit any error.

"The Court: Overruled. You may proceed, Mr. Lashkowitz.

"Q. (By Mr. Lashkowitz) How many times, sir? A. What do you mean, all my life?

"Q. Well, I don't know, I haven't lived your life. A. That is what I am asking you. I am asking you, do you want to know all my life or what?

"Q. You said you had been in jail a good many times. A. I never said I was in jail a good many times. You did.

"Q. Have you been in jail any number of times? A. A few.

"Q. How many times? A. I wouldn't say because I don't know.

"Q. Don't you remember? A. No.

"Q. How often would you be put in jail? A. How often?

"Q. Yes.

"Mr. Murray: I object to that as improper cross-examination and prejudicial.

"The Court: Overruled.

"A. About four or five times.

"Q. (By Mr. Lashkowitz) Four or five times, is that all? A. Yes."

The prejudicial effect of such questioning of defendants concerning matters entirely irrelevant to the issues is apparent. Questioning White Bear about his illegitimate family, and multiplying questions to both defendants about their arrests for alleged disorderly conduct and petty misdemeanors necessarily prejudiced the jury against them. A conviction so obtained may not be sustained in this court.

Reversed with direction to dismiss as to Packineau and to grant a new trial to White Bear in accordance herewith.

SANBORN, Circuit Judge (dissenting).

The record shows that the crime the defendants were accused of having committed was investigated by the Indian Police and the Federal Bureau of Investigation; that the grand jury indicted the defendants; that, on their pleas of not guilty, they were tried to a jury and before a judge who was fair and impartial; that the case was submitted to the jury under instructions to which no exceptions were taken; that the jury returned a verdict of guilty; and that the judge subsequently denied the defendants' motions for a new trial. This Court now rules that the defendant Packineau was entitled to be acquitted, although the Government's evidence shows that he was present at the time the crime was committed, that he was the one who first attacked the prosecutrix, and that his striking her on the jaw enabled the defendant White Bear, Jr., to accomplish his purpose. White Bear, Jr., is granted a new trial largely on the ground that the defendants in their cross-examination of the prosecutrix were not permitted to ask her whether she had had improper relations with another Indian about a year before the trial. The offer of proof made by the defendants in connection with her cross-examination did not state that she would so testify, and there was no basis for believing that she would have admitted what the defendants were offering to prove by her. The offer was not renewed by the defendants after the Government had rested its case, obviously because each of them denied having attacked her or having had improper relations with her at the time the offense was alleged to have been committed. The story of the defendants was that she and Neola Spotted Horse had a fight and that the injuries and torn clothing of the prosecutrix resulted from her combat with Neola.

Whether the evidence proffered by the defendants in connection with the cross-examination of the prosecutrix as to alleged specific acts of immorality committed by the prosecutrix with another Indian was admissible at all is a very doubtful question, although, as the majority opinion states, the cases on the subject are in conflict. See Annotations in 65 A.L.R. 410 and 140 A.L.R. 364. Personally, I think that the proffered evidence was incompetent, irrelevant and immaterial and had no bearing whatever upon any issue in the

case. Assuming, however, that the evidence would have been admissible for some purpose and at some stage of the proceedings, the District Court was not required to permit the defendants, upon their cross-examination in chief of the prosecutrix, to question her about the matter. The extent to which a prosecutrix in a rape case may be cross-examined in chief as to alleged specific acts of sexual misconduct rests largely in the sound discretion of the trial court. See and compare, Lovely v. United States, 4 Cir., 175 F.2d 312, 314; State v. Brown, 185 Minn. 446, 241 N.W. 591; State v. Trocke, 127 Minn. 485, 487, 149 N.W. 944. The fact that the District Court may have given a wrong reason for a correct or at least a permissible conclusion is of no help to the defendants. In my opinion, it was not reversible error or error at all to refuse to permit the defendants to cross-examine the prosecutrix with respect to the subject matter of their offer of proof. I am satisfied that if such proof was admissible it was properly admissible only in defense and for such bearing as it might have upon the probability of the prosecutrix having consented to the sexual relations which each of the defendants denied having had or having attempted to have with her. See State v. Perry, 151 Minn. 217, 219, 186 N.W. 310; State v. Wulff, 194 Minn. 271, 274, 275, 260 N. W. 515, 516.

There is no sound reason why a prosecutrix in a case such as this, after her direct examination in chief, should be subjected on cross-examination to an attempted besmirching of her character for chastity by insinuation or innuendo. If a defendant in such a case has evidence that the prosecutrix was an immoral woman (either generally or specifically) who probably put up no resistance to his advances, the proper time for him to offer such evidence is in defense. Even an immoral woman has some freedom of selection, and consent obtained from such a woman by a stunning blow on the jaw is no consent at all.

I am satisfied that, under the evidence in this case, the questions whether the prosecutrix was raped by White Bear, Jr.,

and whether the defendant Packineau deliberately aided White Bear, Jr., in the commission of the crime were questions of fact for the jury, that the trial was not unfair, and that the jury was warranted in convicting both defendants.

The errors referred to in the majority opinion which were not urged by the defendants as grounds for reversal were either not properly preserved for review or are too inconsequential, in view of other evidence in the case, to amount to prejudicial error. See and compare, Apt v. United States, 8 Cir., 13 F.2d 126; Hood v. United States, 8 Cir., 14 F.2d 925, 927; Miller v. United States, 8 Cir., 21 F.2d 32, 36–38, certiorari denied 276 U.S. 621, 48 S.Ct. 301, 72 L.Ed. 735; Salerno v. United States, 8 Cir., 61 F.2d 419, 424; Morgan v. United States, 8 Cir., 98 F.2d 473, 476–477; Lovely v. United States, 4 Cir., 175 F.2d 312, 314.

I think the Government is entitled to an affirmance of the conviction of the defendants of the crime charged against them.